

Signed December 15, 2011.

Ronald B. King
United States Chief Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND-ODESSA DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ADOBE TRUCKING, INC., | § | CASE NO. 10-70353-RBK |
| | § | |
| DEBTOR | § | CHAPTER 11 |
| _____ | § | |
| | § | |
| ADOBE OILFIELD SERVICES, LTD. | § | |
| AND ADOBE IRONWORKS, LTD., ET AL. | § | |
| | § | |
| VS. | § | ADVERSARY NO. 11-7005-RBK |
| | § | |
| PNC BANK N.A., M&I BUSINESS | § | |
| CREDIT, LLC, LAND HOLDING, | § | |
| LLC, AND PAUL FRANK | § | |

OPINION

The main issue in this adversary proceeding is whether a personal property foreclosure sale was

commercially reasonable.  The Court holds that the sale was commercially reasonable.

A.     *The Parties*.

Four related Adobe entities in Odessa, Texas, are owned and controlled chiefly by Larry

Bohannon, Reed Gilmore, and Jim Gilmore:

| | | |
|---|---|---|
| Plaintiff: | Adobe Oilfield Services, Ltd. ("AOS"); |
| Plaintiff: | Adobe Ironworks, Ltd. ("Ironworks"); |
| Defendant: | Adobe Drilling Services, Ltd. ("Drilling"); and |
| Defendant: | Adobe Trucking, Inc. ("Trucking"). |

AOS and Ironworks filed this lawsuit in Ector County, Texas, against Drilling, Trucking, PNC Bank,

N.A. ("PNC"), M&I Business Credit, LLC ("M&I"), Land Holding, LLC, and Paul Frank (an officer

of PNC). It was removed to bankruptcy court, and the parties were realigned and consented to the entry

of final orders or judgment by this Court. Various interrelated core and non-core counterclaims and

cross claims have also been filed.

B.     *The Credit Agreement*.

Drilling and Trucking (collectively the "Adobe Defendants") are two of the Adobe companies

under common ownership based in Odessa, Texas. Prior to 2009, Drilling provided contract drilling

services and equipment to customers in the Permian Basin of west Texas and in southeast New Mexico.

Trucking supported Drilling with a fleet of trucks and trailers, in addition to forklifts, loaders, and other

equipment. Trucking's equipment was used to transport, mobilize, and demobilize drilling rigs for

Drilling.

On December 28, 2006, Drilling and Trucking, the Adobe Defendants, entered into a Revolving

Credit and Security Agreement (the "Credit Agreement") for a $37,500,000 five-year revolving credit

facility with various financial institutions (collectively, the "Lenders"). The Credit Agreement provided

that New York law would control. PNC was the lead bank and served as agent for the Lenders. After

2

defaults by the Adobe Defendants, the parties amended the Credit Agreement on March 6, 2007, and again on July 12, 2007, to cure the defaults and increase the revolving credit available to the Adobe Defendants to $47,500,000.

C.      *The Collateral*.

To secure the obligations of the Adobe Defendants under the Credit Agreement, the Lenders were granted a security interest in all of the assets of the Adobe Defendants, including equipment and inventory, such as drilling rigs, trucks, trailers, and related equipment (the "Collateral").

D.      *The Landlord Waivers*.

To ensure the priority of the Lenders' security interest, PNC obtained two Landlord Waiver agreements at the time the Credit Agreement was executed. The first Landlord Waiver covered the premises located at 8124 Sprague Road in Odessa, Texas (the "Premises"). It was signed by another Adobe related entity, Third Party Defendant, Mesquite Bean Properties, Inc. ("Mesquite"), and Plaintiff AOS. The second Landlord Waiver covered the premises located at 960 South Pagewood in Odessa, Texas (also the "Premises"). It was signed by Mesquite, AOS, and the other Plaintiff, Ironworks.

Pursuant to paragraphs 1 and 3 of the Landlord Waiver agreements, Mesquite, AOS, and Ironworks subordinated any present or future liens they may have in the Collateral to the Lenders and agreed that PNC could enter the respective premises at any time to remove the Collateral:

1.      Any and all liens, claims demands or rights, including but not limited to the right to levy or distrain for unpaid rent, which the Undersigned now has or hereafter acquires on or in any of the Collateral shall be subordinate and inferior to the lien and security interest of the Bank, and as to the Bank, the Undersigned hereby specifically waives and relinquishes all rights of levy, distraint or execution with respect to such property.

. . . .

3

3.     The Bank may at any time enter upon the Premises and remove the Collateral. The Bank may also take possession of the Collateral on the Premises, and may remain on the Premises for an unlimited time, without charge, in order to dismantle, prepare for disposition or removal, dispose of or otherwise deal with the Collateral.

E.     ***The Adobe Defendants' Default***.

In the summer of 2007, the Adobe Defendants were again admittedly in default under the Credit Agreement. The Credit Agreement required the Adobe Defendants to maintain a defined Fixed Charge Coverage Ratio, which evidenced their ability to satisfy the fixed financing expenses set forth in the Credit Agreement, and to certify their compliance on a monthly basis. As of June 30, 2007, the Adobe Defendants' Fixed Charge Coverage Ratio was below the ratio required by the terms of the Credit Agreement. Drilling and Trucking repeatedly certified in writing that they were not in compliance.

The Adobe Defendants were also required to limit their Capital Expenditures, as defined under the Credit Agreement, to no more than $4,000,000 during the entire 2007 fiscal year. By July 31, 2007, the Adobe Defendants' Capital Expenditures during the 2007 fiscal year had already exceeded the limit. PNC notified the Adobe Defendants of these defaults; however, they were never cured.

Over the next year, there were additional defaults, including failing to achieve a defined Minimum Rig Fleet Inventory Utilization Rate of at least 75%, and failing to properly invoice customers, as required by the Credit Agreement. PNC provided the Adobe Defendants with further notice of these defaults. The Adobe Defendants again failed to cure their defaults under the Credit Agreement.

Paradoxically, while the Adobe Defendants were in continuous default under the Credit Agreement, oil prices steadily rose during the first half of 2008 to a high of $145 per barrel in July, and demand for drilling rigs was strong. Prices plummeted thereafter, however, to a low of $35 per barrel

4

in January, 2009. The drop in oil prices and freezing of credit markets in the fall of 2008 predictably caused a drastic decrease in demand for drilling rigs. Business was so bad that Drilling and Trucking suspended most drilling operations in the fall of 2008 and elected to stack most of their rigs. Unable to obtain takeout financing with a third party or another workout with PNC, they made the strategic decision to shut down the business and orchestrate an attack on the foreclosure process.

F.     *The Foreclosure.*

In early December, 2008, the Adobe Defendants were still in default under the Credit Agreement, and PNC and the Lenders chose to exercise their default remedies. On December 31, 2008, PNC's counsel, Andrews Kurth LLP, sent the Adobe Defendants a foreclosure notice (the "Foreclosure Notice") stating, among other things, that a public foreclosure sale of the Collateral would occur at 11:00 a.m. on January 16, 2009, at the offices of Andrews Kurth LLP, 600 Travis Street, Suite 4200, Houston, Texas 77002. The Adobe Defendants did not pay the obligations owed to the Lenders by the time of the foreclosure sale. More than once, PNC in writing requested possession of the Collateral prior to the foreclosure sale, but the Adobe Defendants did not comply.

In preparation for the sale, Andrews Kurth LLP placed a Notice of Sale in the *Dallas Morning News*, the *Odessa American*, and the *Midland Reporter-Telegram* on January 6, 2009. These newspaper notices were the only public advertisements of the sale. Each advertisement ran for one day. The Notice of Sale stated that: (1) PNC and M&I would conduct a public sale to the highest qualified bidder of all the Collateral including ten drilling rigs; (2) PNC reserved the right to bid for and purchase the Collateral and to credit the purchase price against the amounts due to the Lenders from the borrowers plus all expenses in connection with the sale of the Collateral; and (3) inquiries should be directed to a named attorney at Andrews Kurth, LLP. On the day of the foreclosure sale, PNC was not

5

in possession of the Collateral and had not cleaned, painted, or set up the Collateral prior to the sale. PNC was the winning bidder for all the Collateral, with a credit bid of $41,000,000.

G.     ***Transfer of the Collateral from PNC to Land Holding, LLC***.

On January 16, 2009, pursuant to a Transfer Statement and Bill of Sale and Assignment, PNC transferred all of its right, title, and interest in the Collateral to Land Holding, LLC, an affiliate of PNC which holds and disposes of foreclosed assets.  The Transfer Statement and Bill of Sale and Assignment of Claims authorized and empowered PNC to take possession of the Collateral and enforce Land Holding, LLC's rights to the Collateral.

H.     ***Adobe Sues Adobe and Denies PNC Access to the Collateral***.

Fifty minutes *before* PNC foreclosed on the Collateral, AOS and Ironworks (collectively, the "Adobe Plaintiffs") filed this lawsuit in state court in Ector County, Texas against the Adobe Defendants and PNC, claiming liens on the Collateral.  The Adobe Plaintiffs contended that their sister companies, the Adobe Defendants, failed to pay for repair work, maintenance, and related services that the Adobe Plaintiffs provided, thereby giving the Adobe Plaintiffs possessory liens on the Collateral. The Adobe Defendants filed their cross claim against PNC one hour after the foreclosure sale.  In a series of communications after the foreclosure sale, PNC's counsel advised counsel for Mesquite and the Adobe Plaintiffs that PNC intended to remove the foreclosed Collateral from the Premises and requested that the Collateral be made available for removal.  Despite these requests, the responses clearly indicated that the Adobe entities would not allow the removal of the Collateral.

I.     ***PNC's Collection and Resale of the Collateral***.

On March 13, 2009, the state court signed a Temporary Injunction enjoining Mesquite and the Adobe Plaintiffs, and all entities with common ownership or under the common control of Mesquite

6

and the Adobe Plaintiffs, from taking any action to interfere with or prevent PNC or its agents from entering the Premises and removing the foreclosed Collateral. Shortly thereafter PNC removed all of the Collateral from the Premises. The Collateral removed from the Premises was auctioned by Kruse Energy & Equipment, LLC on April 29 and 30, 2009, in Odessa, Texas. Upon auction by Kruse, the Collateral brought a net recovery of $9,723,788,50. After jousting with PNC in state court for 22 months, Trucking filed a case under Chapter 11 of the Bankruptcy Code on November 23, 2010, and this adversary proceeding was removed from state court. The Adobe Defendants alleged by cross claim that PNC's foreclosure sale was not commercially reasonable.

## DISCUSSION

A. *Judicial Interpretation of the Commercial Reasonableness Standard*.

The rights of a secured party to dispose of collateral after default by a borrower are governed by Article 9 of the Uniform Commercial Code.[1] After default, a secured party may sell, lease, license, or otherwise dispose of any or all of the collateral in its present condition or following any commercially reasonable preparation or processing. N.Y. U.C.C. § 9-610(a). Section 9-610 requires that every aspect of a disposition of collateral must be commercially reasonable, including the method, manner, time, place, and other terms. N.Y. U.C.C. § 9-610(b). The term "commercially reasonable" is not defined in the Code, and courts have not uniformly applied the commercial reasonableness standard when evaluating dispositions of collateral. *Compare European Am. Bank v. Sackman Mortg. Corp*. (*In re Sackman Mortg. Corp*.), 158 B.R. 926, 936 (Bankr. S.D.N.Y. 1993) (holding that summary judgment is inappropriate if there is an issue as to the sufficiency of the price) *with In re*

---

[1]The New York version of the Uniform Commercial Code (the "Code") governs the Credit Agreement.

*Excello Press, Inc.*, 890 F.2d 896, 905 (7th Cir. 1989) (holding under New York law that price received at a commercially reasonable sale is market price).

One reason for the lack of uniformity on what is "commercially reasonable" is an apparent inconsistency in the Code. Section 9-610 states that every term of the sale must be commercially reasonable. The word "term" in this context has traditionally encompassed the sale price. But, in § 9-627, the Code expressly provides that "[t]he fact that a greater amount could have been obtained . . . by the secured party is not of itself sufficient to preclude the secured party from establishing that the . . . [disposition] was made in a commercially reasonable manner." N.Y. U.C.C. § 9-627.

Further, the purpose of the Code provisions requiring a commercially reasonable sale is to produce the highest price possible for the collateral. *See* L.B. Wilkinson, Jr., *Procedures v. Proceeds: Evaluation of the Commercial Reasonableness of Dispositions of Collateral Under Article Nine of the Uniform Commercial Code*, 63 TENN. L. REV. 987, 988 (1996). The Code does not require that price be the sole factor, however. Rather, the Code focuses on other aspects of the sale, specifically on the steps taken by the secured party in conducting the sale to achieve the highest price rather than the price itself. *See* N.Y. U.C.C. § 9-610(b) ("the method, manner, time, place, and other terms must be commercially reasonable").

Despite these varying interpretations, the inquiry into commercial reasonableness is a fact-intensive one that requires an examination of all circumstances of the liquidation. *See* **Excello Press**, 890 F.2d at 905 (applying New York law and stating "[w]hether a sale [is] commercially unreasonable is, like other questions about 'reasonableness,' a fact-intensive inquiry"); *In re Zsa Zsa Ltd*., 352 F. Supp. 665, 671 (S.D.N.Y. 1972), *aff'd*, 475 F.2d 1393 (2d Cir. 1973). To succeed in a suit for a deficiency judgment, the secured party carries the burden of proving that every aspect of the disposition

8

was commercially reasonable. ***Security Trust Co. of Rochester v. Thomas***, 399 N.Y.S.2d 511, 514 (4th Dept. 1977).

    1.    ***Three Tests for Commercial Reasonableness***.

Three tests have been employed by courts to measure the commercial reasonableness of a sale of collateral: (i) the "procedures" test, which examines the fairness and adequacy of the procedures used before and during the sale; (ii) the totality of circumstances test, which looks to the circumstances surrounding the sale and closely scrutinizes transactions where there exists a large gap between the sale price and fair market value; and (iii) the "proceeds" test, which looks solely to the price received for the goods. *See, e.g.,* ***Bankers Trust Co. v. J.V. Dowler & Co***., 390 N.E.2d 766, 769 (N.Y. 1979) ("[S]ome authorities suggest that optimizing resale price is the prime objective of the code's default mechanisms and that the other factors listed are merely designed to ensure that the highest price is achieved . . . . Others would have commercial reasonableness turn on the procedures employed"). Neither the proceeds, totality of circumstances, nor the procedures test are conclusive as to whether a disposition of collateral is commercially reasonable. Rather, there is a split of authority as to which test should be utilized by courts to determine whether the transaction as a whole was commercially reasonable.

    a.    ***The "Proceeds" Test***.

Courts applying the proceeds test may base a finding of commercial unreasonableness solely on a disparity between the price received at the sale and the price the collateral had previously sold for or what the court finds is the collateral's fair market value. *See* Wilkinson, *Procedures v. Proceeds*, 63 TENN. L. REV. at 998. These courts reason that the goal of the Code is that the collateral be sold at the highest price possible, and all other aspects of the sale are reflected in the price received.

9

Under the proceeds test, the primary focus of the court's inquiry is whether the price received upon resale, when compared to the value of the collateral, shows that the disposition was commercially reasonable. The court examines whether "the shortfall of the proceeds (compared with the debt) makes a sale commercially unreasonable without regard to the creditor's efforts to obtain a price as high as possible." ***Excello Press***, 890 F.2d at 905. "A large deficiency might indicate the search for buyers had been inadequate; or it might simply reflect a greatly depreciated piece of collateral." ***Id***.

Courts have consistently declined to disturb a foreclosure sale upon a challenge to the sale price of the collateral, except in the narrow circumstance where the price alone is so inadequate as to shock the court's conscience. ***DeRosa v. Chase Manhattan Mortg. Corp***., 782 N.Y.S.2d 5, 9 (1st Dept. 2004); ***Thornton v. Citibank N.A.***, 640 N.Y.S. 2d 110, 111 (1st Dept. 1996), *lv denied*, 89 N.Y.2d 805 (N.Y. 1996) (noting that foreclosure sales often result in prices substantially less than market value); ***Crossland Mortg. Corp. v. Frankel***, 596 N.Y.S.2d 130, 131 (2d Dept. 1993), *lv denied*, 82 N.Y.2d 655 (1993) (sale price of $55,000 for property with market value between $160,000 and $200,000 upheld); ***Frank Buttermark Plumbing & Heating Corp. v. Sagarese***, 500 N.Y.S.2d 551, 552 (2d Dept. 1986), *lv denied*, 68 N.Y.2d 607 (1986) (sale at 30% of defendants' uncorroborated opinion as to fair market value upheld); *cf.* ***Dougherty v. 425 Dev. Assoc***., 462 N.Y.S.2d 851, 856 (1st Dept. 1983) (question as to commercial reasonableness where property sold for less than 50% of purchase price one year earlier).

     b.     ***Totality of the Circumstances and Close Scrutiny***.

Some courts do not weigh price as heavily in determining commercial reasonableness. Rather, they look at the totality of circumstances surrounding the sale, with price being an important factor.

Courts using this approach generally look at other aspects of the sale with "close scrutiny" when there is a significant price disparity between the value of collateral and amount realized.

The case most often cited for the totality of circumstances approach is *In re Zsa Zsa, Ltd*., 352 F. Supp. 665 (S.D.N.Y. 1972), *aff'd*, 475 F.2d 1393 (2d Cir. 1973).  In that case, the bankruptcy trustee challenged the $300,000 sale price of collateral, which had an estimated retail value of $3.5 million. The wholesale value was $1.5 million and the cost was $500,000.  The trustee also objected to the terms and timing of the advertisements run by the creditor.  Beginning eight days prior to the sale, the creditor advertised the sale in *The New York Times*.  The advertisement described the goods, stated the conditions of the sale, referred to samples that prospective bidders could inspect prior to the sale, and stated that the sale was subject to the referee's approval.  The creditor hired an experienced auctioneer, and fourteen people attended the sale.  Further, the goods were divided into lots, and bids were taken on the individual lots and upon the inventory as a whole.  *Id*. at 667-69.

The court indicated that a determination of commercial reasonableness hinged not on a few minor defects in the sale, but on the totality of circumstances surrounding the sale:

> It is the aggregate of circumstances in each case–rather than specific details of the sale taken in isolation–that should be emphasized in a review of the sale.  The facets of manner, method, time, place and terms cited by the Code are to be viewed as necessary and interrelated parts of the whole transaction.

*Id*. at 670.

The court also stated that the focus of commercial reasonableness is not the proceeds of the sale, but the procedural aspects of the sale, and if the creditor takes sufficient pains to conduct the sale according to commercially acceptable standards, "he should be shielded from the sanctions contained in Article 9."  *Id*. at 671.  As to price, the consideration received was still relevant in the commercial

11

reasonableness determination, according to the court. It noted that a large gap between the price received at the foreclosure sale and the estimated market value "signals a need for close scrutiny." *Id*. The court held that the sale was commercially reasonable and that a secured party is not the insurer of a hypothetical expected return. *Id*. at 672.

c.     <strong><em>The "Procedures" Test</em></strong>.

The procedures test focuses on how the sale was conducted and the efforts made by the creditor to achieve the best price; however, the price itself is not determinative on the issue of whether the sale is commercially reasonable. The reasoning is that if a sale is conducted in a commercially reasonable manner, the price received is the optimum price at that time and in that particular market.

The position was clearly articulated by Judge Easterbrook in *In re Excello Press, Inc.*, 890 F.2d 896 (7th Cir. 1989). Excello Press was a commercial printer in Illinois. In 1980, it purchased two printers for $3,000,000, financed over a ten-year period. MetLife retained a purchase money security interest in the presses. In October, 1985, Excello Press filed a chapter 11 case while still owing MetLife $2.7 million for the presses. The bankruptcy court granted MetLife relief from the automatic stay so that it could repossess and sell the collateral pursuant to Article 9. The court, however, placed a cap of $900,000 on MetLife's deficiency claim. Over six months before the sale, MetLife began soliciting bids from likely purchasers with the help of the manufacturer of the equipment. Both machines sold at a private sale for a total of $1.1 million. Thereafter, MetLife filed a $900,000 deficiency claim. *Id*.

At trial, both parties put on evidence as to the fair market value of the presses. *Id*. at 898-99. MetLife argued that because of the cap on the amount of the deficiency that was recoverable, it had every incentive to attempt to receive the highest price possible at the sale. The trial judge found that

12

MetLife failed in its duty to provide notice to Excello.  Under New York law, failure to provide notice in such a sale created the presumption that the collateral's fair market value at the time of the sale equaled the amount of the debt.  The trial judge found that MetLife had not overcome this presumption and, on motion for reconsideration, held that because improper notice was given, the price received at the sale could not be used as evidence of fair market value.  Thus, commercial reasonableness was irrelevant.  *Id*.

On review by the Seventh Circuit, Judge Easterbrook found the appropriate inquiry to be whether the requirements of § 9-610 had been met.  He faulted the lower courts for failing to consider the price received at the foreclosure sale as the fair market value absent a showing of commercial unreasonableness in the procedures used to conduct the sale.  *Id*. at 905.  Judge Easterbrook wrote:

> If despite the lack of notice the sale was commercially reasonable, the price is more than merely informative.  The product of a commercially reasonable sale *is* the fair market value.  If the secured party can prove that the sale was commercially reasonable, it has proved the market value of the collateral . . . .  The price obtained in a commercially reasonable sale is not *evidence* of the market value . . . . It *is* the market value.

*Id*. at 904-05 (emphasis in original).

The court next held that a sale could be commercially reasonable even though notice was faulty. *Id*. at 905.  The court noted that lack of notice is not determinative when the debtor is adequately protected.  Rather, the general obligations of good faith and commercial reasonableness protect the debtor.  In attempting to define commercial reasonableness, the court opined that "no magic set of procedures will immunize a sale from scrutiny."  *Id*.  Courts should look at the specific market, the specific collateral, and apply the law to the facts in each case.  The court further stated:

> [T]he court must decide what a reasonable business would have done to maximize the return on the collateral.  It must consult "customs and usages that actually govern the

members of a business calling day-in and day-out [that] not only provide a creditor with standards that are well recognized, but tend to reflect a practical wisdom born of accumulated experience."

*Id*. at 906 (quoting *Bankers Trust Co. v. J.V. Dowler & Co.*, 390 N.E.2d 766, 769 (N.Y. 1979)).

Thus, Judge Easterbook stated the essence of the procedures test. Simply put, the court should not look at the foreclosure sale price as evidence of commercial unreasonableness unless a procedural aspect of the sale is deemed commercially unreasonable. Likewise, if the creditor proves that the sale was conducted in a commercially reasonable manner, the court should not allow evidence as to fair market value. *Id*. at 907.

2. ***New York's Adoption of the "Proceeds" and "Procedures" Tests***.

New York courts accept both the proceeds and procedures tests as valid and assert that they both apply in the evaluation of a sale. *FDIC v. Herald Square Fabrics Corp*., 439 N.Y.S.2d 944, 954 (2d Dept. 1981); *see also Bankers Trust Co. v. J.V. Dowler & Co.*, 390 N.E.2d 766, 769 (N.Y. 1979); *European Am. Bank v. Sackman Mortg. Corp*. (*In re Sackman Mortg. Corp*.), 158 B.R. 926, 936 (Bankr. S.D.N.Y. 1993). Accordingly, if the commercial reasonableness of a post-default disposition of collateral is questioned under New York law under the proceeds or procedures test, the secured party must be put to its proof in order to demonstrate commercial reasonableness. *Herald Square Fabrics*, 439 N.Y.S.2d at 954.

B. ***Effect of Credit Agreement on Commercial Reasonableness of Sale***.

While parties may not waive the requirement that a disposition of collateral be commercially reasonable, § 9-603 expressly provides that "[t]he parties may determine by agreement the standards measuring the fulfillment of the rights of a debtor . . . and the duties of a secured party . . . if the

standards are not manifestly unreasonable." N.Y. U.C.C. § 9-603. Similar to the lack of consensus on what is "commercially reasonable," existing case law fails to establish a uniform test for what is "manifestly unreasonable" in the foreclosure standards context.

Parties are free to define the behavior constituting commercial reasonableness so long as the standards are not so outside the range of acceptable commercial behavior that no reasonable person would ever agree to them. N.Y. U.C.C. §§ 9-602(g), 9-603; *Mitchell v. Wash. State Inst. of Pub. Policy*, 225 P.3d 280, 288 (Wash. App. Div. 2009) ("A decision is 'manifestly unreasonable' if [a party] . . . adopts a view that no reasonable person would take, and arrives at a [result] outside the range of acceptable choices"). Courts which have addressed the issue find that where a contract provision exists dictating terms of sale which are not "manifestly unreasonable," and the sale is performed in accordance with those terms, the sale cannot be considered commercially unreasonable. *Orix Credit Alliance, Inc. v. East End Dev. Corp*., 688 N.Y.S.2d 191, 192 (2d Dept. 1999); *see also Jones v. United States (In re Jones)*, 107 B.R. 888, 895-96 (Bankr. N.D. Miss. 1989) (holding security agreement provisions manifestly unreasonable where secured party not required to give written notice of sale to debtor and no evidence presented that reasonable commercial practices were otherwise followed or that price received represented a fair market value).

The *East End Development* court emphasized that the prohibitions in the Code regarding the ability of parties to define what is commercially reasonable "were designed to prohibit agreements which relieved secured creditors 'from virtually all responsibility with respect to the collateral and as such cannot be enforced.'" *East End Dev. Corp*., 688 N.Y.S.2d at 192 (citing *FDIC v. Marino Corp*., 425 N.Y.S.2d 34, 36 (2d Dept. 1980)). In finding the agreements at issue in that case were not

15

"manifestly unreasonable," the court noted that the agreement provided for prior notice to the debtors of the public sale of the collateral, prior newspaper advertisement of the sale, and mandatory terms of purchase at a public sale. *Id*.

In *Wombles Charters, Inc. v. Orix Credit Alliance, Inc*., 1999 WL 498224 (S.D.N.Y. 1999), the plaintiffs argued that the foreclosure sale of a bus was commercially unreasonable because the advertising was inadequate, the payment terms were too harsh, and because the payment received was inadequate. In rejecting the first two arguments, the court looked to the terms of the security agreement, which provided that "any public sale will be deemed commercially reasonable if notice thereof shall be mailed to Mortgagor at least 10 days before such sale and advertised in at least one newspaper of general circulation in the area of the sale at least twice prior to the date of the sale and if upon terms of 25% cash down with the balance payable within 24 hours." *Id*.

The court noted that the October 1, 1998 sale was advertised in the *Philadelphia Inquirer* on September 19 and 28, 1998. According to the court, further advertisement was not required by the security agreement, although the defendant also sent notice of sale to twenty-three other potential purchasers of the bus. The court further noted that all advertisements were simple and to the point, contained descriptions of the bus, the location, time, and terms of the sale, and gave contact information to potential buyers. The court concluded that the advertisements were in accordance with the contractually agreed upon terms, and "the parties themselves decided that a sale would be commercially reasonable if it met the requirements of the Security Agreement. Since [the] sale [met] those requirements . . . they are not 'manifestly unreasonable.'" *Id*.

16

C.    *Whether PNC's Foreclosure Sale Was Commercially Reasonable*.

The Adobe Defendants claim that the foreclosure sale of the Collateral securing the $47.5 million line of credit extended under the Credit Agreement was commercially unreasonable under the governing New York law.  New York courts accept both the proceeds and procedures tests as valid and often apply both in the evaluation of a sale.  In order for the sale at issue to be deemed commercially reasonable, this Court must be satisfied that the proceeds obtained were adequate and the procedures employed by the Lenders were undertaken in good faith to maximize return on the Collateral.

1.    *The Credit Agreement Was Not Manifestly Unreasonable*.

Where, as here, a security agreement includes provisions addressing activities that are deemed to be commercially reasonable, the party challenging the foreclosure sale must prove that those provisions were "manifestly unreasonable." *See Orix Fin. Servs., Inc. v. Thunder Ridge Energy, Inc*., 2005 WL 587483 at *16 (S.D.N.Y. Mar. 8, 2006).  The complaining party must establish that no reasonable person would view those activities as reasonable under the circumstances.  The Credit Agreement provided reasonable standards for the foreclosure process, but did not purport to waive the rights of the Adobe Defendants under the Code.

2.    *The Sale Was Commercially Reasonable Under a "Proceeds" Analysis*.

The Credit Agreement authorized PNC, as the Lenders' agent, to sell the Collateral "at public or private sale, at any time or place, in one or more sales, at such price or prices, and upon such terms, either for cash, credit, or future delivery, as Agent may elect."  Credit Agreement § 11.1(a).  It further provided that "[a]t any public sale Agent or any Lender may bid for and become the purchaser, and Agent, and any Lender or any other purchaser at such sale thereafter shall hold the Collateral sold

17

absolutely free from any claim or right of whatsoever kind, . . . and all such claims, rights and equities are hereby expressly waived and released by each Borrower." *Id*.

The Adobe Defendants complain about the amount of the Lenders' winning credit bid at the foreclosure sale. Under the proceeds analysis, however, "a significant discrepancy between the original purchase price and the sales price does not, by itself, create a triable issue of fact." *First Fed. Sav. & Loan Ass'n of Rochester v. Romano*, 676 N.Y.S.2d 163, 164 (1st Dept. 1998). Property offered at a foreclosure sale frequently produces a price substantially less than market value because such sales are of little interest to the public and those who bid seek to buy at bargain prices. *Polish Nat'l Alliance v. White Eagle Hall Co*., 470 N.Y.S.2d 642, 650 (2d Dept. 1983). "Courts have consistently declined to disturb a foreclosure sale upon a challenge to amount recovered for the collateral, except in the narrow circumstance where the price alone is so inadequate as to shock the court's conscience." *DeRosa v. Chase Manhattan Mortg. Corp*., 782 N.Y.S.2d 5, 9 (1st Dept. 2004).

New York courts have held that sales prices as low as 30% of market value are commercially reasonable, and have routinely upheld sales prices of 50% or more of market value. *Id*. at 9-10 (sale at 45% of market value upheld); *see Romano*, 676 N.Y.S.2d at 164 ("It has been held that bids ranging from as low as 30% . . . and 37% . . . of market value are not unreasonable"); *Polish Nat'l Alliance*, 470 N.Y.S.2d at 649-50 (recognizing that foreclosure sales at prices of more than 50% of value are consistently upheld, and upholding sale at 37% of alleged actual value); *Crossland Mortg. Corp. v. Frankel*, 596 N.Y.S.2d 130, 131 (2d Dept. 1993) (sale at 34% of market value upheld); *Frank Buttermark Plumbing & Heating Corp. v. Sagarese*, 500 N.Y.S.2d 551, 552 (2d Dept. 1986) (sale at 30% of claimant's uncorroborated assessment of fair market value upheld).

18

Here, the sale price was more than 50% of what the Adobe Defendants argue was the Collateral's market value. In addition, PNC's appraiser who testified at trial estimated the value at $33.85 million, which is actually *less* than the PNC credit bid. PNC's appraisal from a different appraiser, prepared well before the foreclosure sale and upon which the Adobe Defendants rely, was admitted by the appraiser in his deposition to be too high in light of the rapidly declining oil and gas market in the fall of 2008 and January, 2009. The $81 million appraisal must be discounted by a factor of 25% to 35% because the price of oil and gas plummeted, and had a similar effect on the value of drilling rigs and related equipment. Finally, upon resale by an auctioneer who advertised the sale, moved the Collateral to a convenient place for sale, and repaired, painted, and set up the Collateral, the price obtained was $31 million less than the PNC credit bid at the foreclosure sale. The sale was commercially reasonable under the proceeds test.

3. ***The Sale Was Commercially Reasonable Under a "Procedures" Analysis***.

The Adobe Defendants complain that PNC did not sufficiently advertise the foreclosure sale by failing to otherwise advertise the sale in any trade journals, the *Wall Street Journal*, or on the internet. New York law, however, does not require that a seller advertise a foreclosure sale in any specific type of media or for any particular amount of time. *See **DeRosa***, 782 N.Y.S.2d at 9 (holding that it was not unreasonable for secured party to advertise in newspaper published outside county of sale). In the present case, the Credit Agreement expressly provided that it is not commercially unreasonable for PNC, as the Lenders' agent, "to advertise dispositions of Collateral through publications or media of general circulation, whether or not the Collateral is of a specialized nature . . . ." Credit Agreement, § 11.1(b)(v).

19

Consistent with this provision, PNC advertised the foreclosure sale by publishing the Notice of Sale for one day in the *Dallas Morning News*, the *Midland Reporter-Telegram*, and the *Odessa American*.  Identical advertisements in each of the three newspapers specified the date, time, location, items for sale, and the nature of the sale.  New York courts have held less notice than this to be commercially reasonable.  *See* ***Orix Fin. Servs., Inc. v. Thunder Ridge Energy, Inc***., 2006 WL 587433 (S.D.N.Y. Mar. 8, 2006) (finding that advertising sale in one general circulation newspaper on two occasions, as provided in the parties' agreement, was commercially reasonable); ***Wombles Charters, Inc. v. Orix Credit Alliance, Inc***., 1999 WL 498224 (S.D.N.Y. July 14, 1999) (same).  It was reasonable for PNC to follow the Credit Agreement's terms.

Additionally, the Adobe Defendants complain that PNC did not clean, set up, or paint any of the equipment prior to the foreclosure sale.  The Adobe Defendants prevented PNC from taking possession of the Collateral prior to the sale.  In violation of the Credit Agreement, they refused to turn over the Collateral, identify its exact location, or provide any cooperation to the Lenders leading up to the foreclosure sale.  Having denied PNC access to the Collateral, the Adobe Defendants cannot complain about inadequate preparation of the Collateral for sale.

Furthermore, the Adobe Defendants agreed in the Credit Agreement that it is commercially reasonable for the Lenders' agent "to fail to incur expenses reasonably deemed significant by the Agent to prepare Collateral for disposition."  Credit Agreement, § 11.1(b)(I).  New York law permits a foreclosing secured party to dispose of collateral "in its present condition or following any commercially reasonable preparation or processing."  N.Y. U.C.C. § 9-610.  Under the Credit Agreement and New York law, preparation of collateral before a foreclosure sale is not mandatory.  In light of the Credit Agreement, New York law, and the fact that the Lenders were prevented from

20

obtaining possession of the Collateral by the Adobe Defendants, there was nothing manifestly unreasonable about PNC selling the Collateral without preparation.

The Adobe Defendants also complain that, prior to the sale, PNC did not have possession of the equipment, did not make it available for inspection, and did not catalog the equipment. Again, the actions of the Adobe Defendants prevented PNC from gaining access to and possession of the Collateral. Where a debtor denies the secured party access to the collateral, it cannot complain about the commercial reasonableness of not making the collateral available for inspection. *See **Cantrade Private Bank Lausanne Ltd. v. Torresy***, 876 F. Supp. 564, 569 (S.D.N.Y. 1995) (rejecting debtor's argument that the secured party's failure to afford interested parties an opportunity to view the collateral prior to the foreclosure sale rendered the sale commercially unreasonable, where the secured party was denied access to the collateral). Moreover, the Credit Agreement authorizes the Lenders' Agent to sell the Collateral in the event of default "[w]ith or without having the Collateral at the time or place of sale." Credit Agreement, § 11.1(a). PNC's reliance upon this contractual provision was reasonable.

The Adobe Defendants also fault the Lenders' decision to conduct a public sale, and that by not delaying the sale, an inadequate price was obtained. New York law provides that a foreclosing creditor may, "[i]f commercially reasonable . . . dispose of collateral by public or private proceedings . . . at any time or place." N.Y. U.C.C. § 9-610(b). Additionally, "the fact that a greater amount could have been obtained" by a sale "at a different time or in a different method from that selected by the secured party" is not sufficient to establish that the disposition was not commercially reasonable. N.Y. U.C.C. § 9-627(a). Moreover, a secured party is under no obligation to delay a foreclosure sale to indulge the debtor's "hope that the [] market might recover in time," when the secured party is faced with "highly unsteady market conditions." ***Bankers Trust Co. v. J. V. Dowler & Co***., 390 N.E.2d 766, 770 (N.Y.

21

1979) (concluding that the secured party had a right to perceive further delay as contrary to its legitimate self interest especially in light of the fact that financial conditions might "worsen with each passing day").  The Credit Agreement tracks New York law by authorizing the Lenders' Agent to "sell the Collateral, or any part thereof, at a public or private sale, at any time or place . . . ."  Credit Agreement, § 11.1(a).  The Lenders contacted other drilling companies to gauge whether there was any level of interest in a private sale, but there was none.  Accordingly, a public sale at the time chosen was not a manifestly unreasonable option.

Finally, the Adobe Defendants complain about the number of bidders that were present at the foreclosure sale.  The fact that a disposition of collateral draws only one or a small number of bids does not, without more, render a sale unreasonable.  *J.V. Dowler*, 390 N.E. 2d at 770.  "When a sale is conducted so as to give a sufficiently broad group of buyers the opportunity to bid, their failure to respond in any particular number may itself be an indication of the market value of the item offered for sale."  *Id*.  *See also Sumner v. Extebank*, 452 N.Y.S.2d 873, 874-75 (1st Dept. 1982) ("The low price paid and the lack of bidders were not the result of a commercially unreasonable sale, but were rather indicative of the lack of demand . . . .").

4.    *Liberty National Bank Case Does Not Control*.

The Adobe Defendants placed heavy reliance on *Liberty Nat'l Bank & Trust Co. of Okla. City v. Acme Tool Div. of Rucker Co*., 540 F.2d 1375 (10th Cir. 1976), interpreting the Oklahoma version of the Uniform Commercial Code.  In *Liberty Bank*, a drilling rig was sold at a foreclosure sale for $42,000 in March, 1972, and resold by the buyer in June, 1972, for $77,705, for a net profit of $19,175.  The foreclosure sale was not advertised beyond notice to 16 creditors and 19 other companies.  The

22

foreclosure sale was held in a snowstorm.  The foreclosure sale was conducted by an attorney for the bank who had no experience in the oil business or in selling drilling rigs.  The rig was surrendered by the owner to the bank, but the rig was not moved to a convenient sale location, cleaned, or painted.  The sale price was well below the market value of $60,000-$80,000, and there was no significant change in the market condition between the foreclosure sale and the resale date.  The court of appeals affirmed the district court judgment which held that the sale was not commercially reasonable.

*Liberty Bank* is not controlling in this case for several reasons.  First, under the procedures analysis, there was no written agreement between the parties, as in this case, which set forth the controlling standards for a commercially reasonable sale.  Second, under the proceeds analysis, the rig in *Liberty Bank* was sold at a below market price and almost immediately resold for a profit, rather than being sold at a reasonable bid price and then resold for a $31,000,000 loss.  The absence of a written agreement defining commercially reasonable terms of sale and the substantial gain upon resale in *Liberty Bank* make it inapposite to this case.

## CONCLUSION

PNC's sale of Adobe's assets was commercially reasonable.  Under the proceeds analysis, the sale was commercially reasonable because PNC's credit bid of $41 million was roughly equal to the value of the Collateral on the foreclosure date.  At worst, the bid was 67% of the value of the Collateral.  Under the procedures analysis, the sale was commercially reasonable because the standards set forth in the Credit Agreement were not manifestly unreasonable and PNC fully complied with its terms.  For similar reasons, there was no fraudulent transfer for less than reasonably equivalent value; there were no damages for the loss of any surplus; there was no fiduciary duty of PNC to the Adobe Defendants, and therefore, no breach of fiduciary duty or misappropriation of fiduciary property; there was no

23

contract for, charge, or receipt of usurious interest; and there was no fraud, conversion or theft.  All other claims, counterclaims, and cross claims will be denied.

Judgment will be rendered that all Adobe parties take nothing.  This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Bankruptcy Rule 7052.  A separate judgment will be rendered.

# # #